927 F.2d 1283
 136 L.R.R.M. (BNA) 2841, 118 Lab.Cas. P 10,623
 Robert B. BRENNER, Jude Brenner, Alexander Bronsberg, George
Butchko, Eugene Cardoni, Gerald Drause, Marcella Draus, John
Evanitus, Catherine Evanitus, John Gould, Juanita Gould,
Michael Hardik, Catherine Hardik, Frank Heylek, Margaret
Heylek, Donald Hoyt, Marie Hoyt, Robert T. Johnson, Mary Lou
Johnson, Joseph A. Kopeza, Jr., Catherine Kopeza, Nicholas
Kovalchik, Bernadine Kovalchik, Robert Kreidler, Nancy
Kreidler, Stanley J. Mazur, Jr., Dorothy Mazur, Richard E.
Mogavero, Richard F. Mogavero, Robert T. Morgan et ux,
Ronald Petro, Ann Petro, Nicholas Politz, Beverly Politz,
James F. Roberts, Jr., Nancy H. Roberts, Gerald C. Siperko,
Susan K. Siperko, Frank Terescavage, Daniel J. Trotta,
Eugene C. Turner, Alice E. Turner, Wayne Yatsko, Leona
Yatsko, John Zimnicky, and Jean Zimnicky, Appellants,
v.
LOCAL 514, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA; United Brotherhood of Carpenters and Joiners of
America; Keystone District Council, United Brotherhood of
Carpenters and Joiners of America; Edward Blazejewski, Sr.;
George Walish, General Executive, United Brotherhood of
Carpenters and Joiners of America; John Anello,
Representative, United Brotherhood of Carpenters and Joiners
of America; Pat Campbell, General President, United
Brotherhood of Carpenters and Joiners of America.
 No. 90-5277.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 25, 1990.
Decided March 18, 1991.
Rehearing and Rehearing In Banc Denied
April 18, 1991.
 
 Peter J. Deeb, James O. Castagnera (argued), Saul, Ewing, Remick & Saul, Philadelphia, Pa., for appellants.
 Ira H. Weinstock, Edward M. Gleason, Jr. (argued), Ira H. Weinstock, P.C., Harrisburg, Pa., for appellees, Local 514, United Broth. of Carpenters and Joiners of America; Keystone Dist. Council, United Broth. of Carpenters and Joiners of America; and Edward Blazejewski, Sr.
 Stephen C. Richman, Regina C. Hertzig (argued), Markowitz & Richman, Philadelphia, Pa., for appellees, United Broth. of Carpenters and Joiners of America, George Walish, and John Anello.
 Before SLOVITER, Chief Judge[1], BECKER and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Plaintiffs, members of Local 514, United Brotherhood of Carpenters and Joiners of America and their wives, filed suit in the Middle District of Pennsylvania against Local 514 (the Local), the Keystone District Council, the United Brotherhood of Carpenters and Joiners of America (the International), and various officials of the local and international unions alleging that plaintiffs had been treated discriminatorily in retaliation for their internal union activities. Plaintiffs asserted a claim under section 301 of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 185, a claim under sections 101(a) and 609 of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Secs. 411(a) and 529, and various pendent state law claims. The district court granted summary judgment in favor of the international union and its officials on all five of the plaintiffs' counts. It also granted summary judgment in favor of the local union and the remaining defendants on four of the five counts and, as to the remaining count which alleged a breach of the duty of fair representation under section 301, applied a six-month limitations period. Because there remains pending the portion of that claim which is based on acts within the six-month period, the district court certified its order granting summary judgment on the other claims as final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Therefore, this court has appellate jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 I.
 BACKGROUND FACTS AND PROCEDURAL HISTORY
 
 2
 Although there is a substantial dispute with respect to the underlying facts, for the purpose of the summary judgment motions we will construe the facts in the light most favorable to the plaintiffs.
 
 
 3
 Defendant Edward Blazejewski, Sr. was the business agent of Local 514 in 1979 when it was discovered that the local union election ballots had been marked so that Blazejewski was able to ascertain which union members had opposed his candidates. Blazejewski's son, Edward Blazejewski, Jr., was on the slate of candidates for which Blazejewski campaigned. Most of the plaintiffs allege that they voted against Blazejewski's candidates in this election and were thereafter discriminated against in several ways. The other plaintiffs allege that the retaliation against them began either after they challenged Blazejewski's conduct as the business agent or otherwise manifested opposition to his leadership. Some of the union members notified the International Union in writing about the marked ballot election, but the International declined to set aside the election or replace Blazejewski as the business agent on the ground that the result of the election had not been affected.
 
 
 4
 Pursuant to its collective bargaining contract, the Local maintained a nonexclusive local hiring hall[2], administered by Blazejewski, where union members would sign a hiring hall list when they became unemployed. The longstanding practice within the Local was to refer members to work in order, unless a union member was specifically requested by an employer. Each of the plaintiffs contends that Blazejewski either refused to refer him out to work through the hiring hall or consistently referred him to undesirable assignments, such as at distant locations or for short-term assignments at a reduced income. In addition, some of the plaintiffs submitted affidavits stating that Blazejewski arranged for the discontinuation of their health care benefits, selectively enforced valid union rules against them, used an admittedly illegal fund to pay only those strikers who were loyal to him, and threatened and otherwise intimidated opposition members. Eleven of the plaintiffs withdrew from Local 514 during Blazejewski's tenure, allegedly because they could no longer afford to pay their union dues, or support themselves and their families without work referrals.[3]
 
 
 5
 Some of the plaintiffs filed charges with the National Labor Relations Board (NLRB) in early 1984, protesting the hiring hall system and alleging that Blazejewski refused to refer certain carpenters in retaliation for their internal union activities. The NLRB found that charges filed by certain of the plaintiffs were without merit, but it proceeded to a settlement with the Keystone District Council with respect to the hiring hall charges filed by others of the plaintiffs.
 
 
 6
 Some plaintiffs also complained in writing to the International in 1983 and 1986, specifically calling the International's attention to the failure of Blazejewski to refer certain carpenters for employment. There were also other written complaints to the International between 1982 and 1986 which mentioned hiring hall abuses in addition to other misconduct by the Local. In 1983, the International appointed John Anello to investigate the charges, and he reported that there was no basis for the allegations of hiring hall impropriety. The International again appointed Anello to investigate the 1986 charges. He reported that there was some truth "on both sides of the fence" but that this would be a moot question because Blazejewski was retiring in a month. App. at 727. He recommended looking into the hiring and referral system thereafter, and a more formal procedure governing referrals was instituted after Blazejewski's retirement.
 
 
 7
 Plaintiffs filed this suit in the district court on October 3, 1986. Their claim under section 301 of the NLRA asserted that Local 514 and the Keystone District Council breached their duty of fair representation by refusing to refer plaintiffs to work and otherwise discriminating against them in retaliation for their intra-union activities, and that the International participated in, ratified, encouraged, or affirmed this wrongful conduct. Their claim under sections 101(a) and 609 of the LMRDA filed against the Local, District Council, and International as well as Blazejewski and the officials of the International, George Walish, the General Executive, John Anello, and Pat Campbell, General President, asserted that plaintiff union members were improperly disciplined for exercising their rights protected by Title I of that statute.
 
 
 8
 All of the defendants filed motions for summary judgment. The district court held that plaintiffs failed to establish a basis for relief under the LMRDA because they had not alleged any official union conduct with respect to their mistreatment, and therefore the defendants' conduct could not constitute "discipline" within the meaning of section 609 of the LMRDA.
 
 
 9
 As to plaintiffs' section 301 claim, the district court held that the International, which was not a party to the collective bargaining agreement, could not be held responsible for the Local's abuses in administering the hiring hall referral system and that the International's failure to intervene did not constitute a breach of its own constitution. The court also held that plaintiffs failed to produce sufficient evidence to show that the International encouraged, authorized or ratified the Local Union's conduct. As a result, the court concluded that plaintiffs failed to establish a basis for the International's liability under section 301, and it followed that the plaintiff wives could not recover from the International under their derivative loss of consortium claim.
 
 
 10
 With respect to the section 301 claim against the Local, the district court applied the six-month limitations period found in section 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b), and held that the continuing violation theory does not apply to this case to extend the limitations period. Thus, all claims which occurred prior to April 4, 1986 were found to be time-barred.[4]
 
 
 11
 As noted above, the district court certified its order under Rule 54(b). Our standard of review of the grant of a summary judgment motion is plenary. Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir.1990). Summary judgment can be granted only if there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment must be denied. Id. We turn to that issue.
 
 II.
 NLRA CLAIM
 A.
 
 12
 Maintenance of the Sec. 301 Claims Against the Unions
 
 
 13
 The Local Union (referring throughout to the Local, the District Council, and Blazejewski)[5] does not contest that the allegations of failure to refer union members fairly from the hiring hall constitutes a breach of the union's duty of fair representation cognizable under section 301 of the NLRA. As the Supreme Court noted in Breininger v. Sheet Metal Workers International Association Local Union No. 6, 493 U.S. 67, 110 S.Ct. 424, 437, 107 L.Ed.2d 388 (1989), a union gains the ability to refer workers for employment through a hiring hall because of its status as a Board-certified bargaining representative. It stated: "Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unit have entrusted the union with the task of representing them." Id. The Court continued: "That the particular function of job referral resembles a task that an employer might perform is of no consequence. The key is that the union is administering a provision of the contract, something that we have always held is subject to the duty of fair representation." Id.
 
 
 14
 On the other hand, the International Union (encompassing also its officials) does vigorously challenge maintenance of a section 301 claim against it. Unlike the Local, it is not a party to the collective bargaining agreement and thus it claims it cannot be held liable for a breach of the duty of fair representation. The International argues that it cannot be held responsible for the unlawful conduct of its affiliated local unions unless it either instigated, supported, ratified, or encouraged such conduct, or it assumed a duty to the employer or union members to prevent such conduct. It claims that there is no evidence that it did any of these things.
 
 
 15
 The International's position finds strong support in the decision of the Supreme Court in Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 218, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979), where it held that the international union was not responsible for the local union's strikes when the international union did not instigate, support, ratify, or encourage any of the local union's work stoppages. Thereafter, this court applied Carbon Fuel in Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 382 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982), holding that the international union was not liable to the employer because it was not a party to the collective bargaining agreement, and that the international's employees could be liable only if they induced a breach of contract by the local union.
 
 
 16
 Plaintiffs respond that the International Union is liable because its failure to step in and remove the discrimination amounted to an instigation, support, ratification, or encouragement of the abuses suffered by the plaintiffs. Alternatively, they argue that the International assumed a duty to the plaintiffs to prevent such discrimination in its constitution.
 
 
 17
 To support their allegation that the International Union ratified or encouraged the Local Union's conduct, the plaintiffs direct the court's attention to the fact that the International did nothing to help the plaintiffs despite numerous pleas to both the International Union and the NLRB. The record is indeed replete with evidence of notice by plaintiffs to the International. Thus, for example, plaintiff John Zimnicky began writing to the International as early as June 1982 complaining about inequities in job referrals. Anello admitted in his deposition that he was reluctant to second-guess anything that Blazejewski did as business representative. Moreover, Anello, the International Union's "general representative" (which he also described as the "representative of the General President," App. at 761), personally witnessed at least one incident of physical abuse by Blazejewski against a dissident union member. App. at 292.
 
 
 18
 Although the International may have been intentionally or negligently guilty of tunnel vision, we agree with the district court's holding that the evidence produced by the plaintiffs does not show that the International encouraged, authorized or ratified the actions of the Local in discriminatorily failing to refer plaintiffs to work. It is unrebutted that the International conducted investigations on the two occasions when it received letters written for the specific purpose of protesting hiring hall abuses. It was not required to credit either version of the events as true, for the plaintiffs' letters contained nothing more than allegations of fact. See Rodonich v. House Wreckers Union Local 95, 817 F.2d 967, 973-74 (2d Cir.1987). Indeed, the International Union apparently found at least some merit in plaintiffs' 1986 charges because it took actions to assist the Local Union in reforming its hiring hall administration soon after the investigation.
 
 
 19
 Plaintiffs further assert that the International had notice of the several charges filed with the NLRB alleging hiring hall abuses. Assuming that the International did have notice of such charges, it also would have known that the NLRB found most of them to lack merit. The charges that were meritorious were settled by union members and the Keystone District Council. Thus, the International's failure to act after these charges were filed does not evidence ratification or encouragement of the Local's actions for the same reason that knowledge of the charges made directly to the International does not indicate condonation.
 
 
 20
 Finally, neither the fact that several other letters to the International mentioned hiring hall abuses nor the failure of Anello to take actions after witnessing the verbal and physical attack on a union member demonstrates encouragement or ratification. Mere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union. See Chapa v. Local 18, 737 F.2d 929, 932 (11th Cir.1984) (refusing to hold international union liable for retaliatory discipline by the local union even though an international union official was present at the local union meeting when the unlawful discipline was meted out).
 
 
 21
 In Carbon Fuel, the Court made it clear that in suits against an international for breach of contract, the union's liability will be governed by common law rules of agency as provided expressly in section 301(e). 444 U.S. at 216-18, 100 S.Ct. at 413-15. Although there the issue was responsibility for strikes, the same analysis is applicable here. The Court stated: "In the face of Congress' clear statement of the limits of an international union's legal responsibility for the acts of one of its local unions, it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to actions of the local." Id. at 217-18, 100 S.Ct. at 414-15.
 
 
 22
 Judge Rosenn, in his passionate dissent, reads the record as creating a genuine issue of disputed fact as to whether the International ratified Blazejewski's alleged discriminatory conduct. Although we have concluded otherwise, in light of the spirited presentation in the dissent we will respond in some detail.
 
 
 23
 The dissent's chronicle of references to plaintiffs' complaints to the International merely serves to support the conclusion we already reached that there is evidence in the record that the International had notice of complaints by union members of discriminatory job referrals. We note, however, that the dissent's portrayal may be somewhat misleading, because it gives the impression of repeated and continuous complaints to the International focused on the hiring hall retaliation, the issue here. In fact, many of the letters sent to the International were primarily directed to other grievances, such as the maintenance by Blazejewski of an illegal fund, with a subsidiary reference to the hiring hall charge. For example, the Zimnicky letter quoted by the dissent charging that the General President's office had condoned Blazejewski's gross misconduct for years was primarily directed to the allegation of the local's illegal establishment and administration of the Area 1 Fund.[6]
 
 
 24
 Also, we do not believe that by referring to affidavits, such as that filed by Cardoni, prepared for the purposes of this suit, the dissent can properly conclude that, "[o]nce again, the record reveals that written petitions by the members to the [International] failed to yield any result," Dissenting Op. at 1301.
 
 
 25
 Moreover, in arguing that the International ratified the local's "abuses," the dissent does not confine itself to the allegation of misconduct at issue in this case. Instead, it refers throughout to the International's failure to invalidate the 1979 election. Election improprieties are relevant, if at all, only as background. The issue before us is limited to whether the International ratified Blazejewski's retaliation against plaintiffs for their internal union activities.
 
 
 26
 A careful reading of the dissent shows that it relies for its ratification theory essentially on the International's decision to take no action notwithstanding the complaints.[7] That is insufficient as a matter of law and is not supported by the cases on which the dissent relies. For example, Consolidation Coal Co. v. Local 1702 United Mine Workers, 709 F.2d 882, 886 (4th Cir.), cert. denied, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983), presented a factual situation completely different than that before us. In that case, the court concluded that because "every member, including all officers and committeemen, engaged in the illegal strike, the union had made itself part of the illegality," inasmuch as the union "may only act through its officers, committeemen and members." Id. Nor is this case analogous to those cases where the unions were held liable under a ratification theory because they failed to investigate or take similar action based on undisputed conduct. See Yellow Bus Lines, Inc. v. Local Union 639, 883 F.2d 132 (D.C.Cir.1989), vacated in part, 913 F.2d 948 (D.C.Cir.1990); Prater v. UMWA, 793 F.2d 1201 (11th Cir.1986).
 
 
 27
 Here, it is conceded that the International did exercise its power to conduct an investigation both in 1983 and 1986. Thus, in effect, what the dissent finds objectionable is not that the International failed to acknowledge those complaints made to it, but that it chose, after investigation, to withhold taking further action at that time. The dissent disagrees with the reasonableness of that decision. However, it cites no case which finds a union liable for ratification based on the court's disagreement with a union's conclusion, after investigation, that certain allegations made by members did not warrant intervention.
 
 
 28
 Even if such a theory of ratification were viable, the record does not fairly admit of the conclusion that the International's decision to stay its hand was so unreasonable as to amount to a knowing whitewash, and hence the type of encouragement which could constitute ratification. Anello testified that it was his practice to await an NLRB decision once charges were filed with it. App. at 924-25. The lengthy letter by Siperko referred to by the dissent at Dissenting Op. at 1302, was directed to the NLRB, not to the International. Siperko apparently sent the International a copy of his letter after he filed those charges, see App. at 533, which gave the International, even if it did not know it before, notice that the NLRB would investigate.
 
 
 29
 The complaints by Siperko about the hiring hall referral system together with others filed between December 29, 1983 and June 3, 1985 remained under investigation by the NLRB. It could not have been unreasonable under these circumstances for the International to have awaited some resolution or word from the NLRB as to whether it found that charges against the local had merit. On March 4, 1986, the NLRB found the portion of the charge made by Siperko "that the Union refused to refer you for employment for discriminatory reasons lacks merit." Siperko Deposition, Ex. 9. Similarly, the NLRB had notified Zimnicky on February 14, 1986 that the portion of his charge alleging failure to refer for arbitrary reasons had merit but that "[t]here was insufficient evidence to establish that [he was] not referred for [his] internal union activities." Zimnicky Deposition, Ex. 44.
 
 
 30
 Thus, although on December 11, 1986 the NLRB ultimately settled the charges that the Keystone District Council operated the employment referral system using arbitrary standards when Keystone paid a total of $20,000 to the four charging parties and undertook to use objective standards and criteria, the NLRB found no basis to proceed on the retaliation claim which is the abusive conduct the dissent argues the International ratified. We do not suggest that there is not enough evidence of improper conduct by the local union and its officials to raise an issue of fact as to their liability, but the record belies any conclusion that the International's failure to take action following its 1983 investigation on the complaints forwarded to it constituted a ratification of the local union's actions.
 
 
 31
 The plaintiff union members have failed to designate the requisite "specific facts showing that there is a genuine issue for trial," Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), on the International's ratification of the actions of Local 514. Plaintiffs have not established, beyond mere conclusory allegations, that the International Union's failure to intervene could constitute ratification or encouragement.
 
 
 32
 We turn to the plaintiffs' alternative contention that the International Union assumed a duty to prevent the mistreatment of the members of Local 514 under the provisions of Section 6 of its own constitution. We have previously held that "a federal court has jurisdiction under section 301(a) [of the LMRA] over suits brought by an individual union member against ... the international union for violation of a union constitution." Lewis v. International Bhd. of Teamsters Local 771, 826 F.2d 1310, 1314 (3d Cir.1987).
 
 
 33
 In section 6 of the International Union's constitution, it reserves to itself powers of supervision and intervention. Paragraph D of Section 6 provides:
 
 
 34
 The United Brotherhood of Carpenters and Joiners of America shall have the right to establish supervision over and to conduct the affairs of any subordinate body (including the removal of any or all officers of such subordinate body) to correct financial irregularities or to assure the performance of collective bargaining agreements and the responsibility of the subordinate body as a bargaining agent or to protect the interests and rights of the members or whenever the affairs of the subordinate body are conducted in such a manner as to be detrimental to the welfare of the members and to the best interests of the United Brotherhood, subject, however, to the provisions of Paragraph H of Section 10.
 
 
 35
 (emphasis added). Section 10, referenced there, sets forth the procedures that must be followed before the International may intervene in the affairs of a local union.
 
 
 36
 Assuming that section 6 of the constitution gave the International the right to intervene to require the local fairly to refer union members from the hiring hall, we see nothing in section 6 which can be construed as an obligation undertaken by the International to do so. The retention of regulatory and supervisory powers by the International in Section 6 merely gave it a discretionary right, as distinguished from a duty, to intervene in the affairs of Local 514.
 
 
 37
 The distinction was drawn in Carbon Fuel, 444 U.S. at 218-22, 100 S.Ct. at 414-16, where the Court held that the international union's promise in the collective bargaining agreement "to maintain the integrity of this contract" did not create a duty on the part of the international to use all reasonable means to prevent wildcat strikes. We similarly interpret the constitution at issue here. If the unions and their members wish to impose a contractual duty on the International to intervene and take action in each instance where members charge that a local union has failed to abide by its duty of fair representation, the union's constitution must state such an obligation in more explicit language than is contained in Section 6.
 
 
 38
 The language of the International's constitution relied on by the dissent cannot be fairly read to support its conclusion that the International has the constitutional obligation to intervene to preserve members' rights and enforce local laws. The provision which states that the "vested rights of the members shall be preserved," Section 6A, is inapplicable here because it relates only to the preservation of union members' rights when a local union is established, dissolved, merged or consolidated. The dissent's broad reading of that provision, see Dissenting Op. at 1304 n. 3, is unpersuasive. The provision that the International "shall ... enforce laws for its government and that of subordinate Locals," Section 6E, appears to relate to laws for the structure of the government of the locals, such as elections, rather than to the complaints at issue here.
 
 
 39
 In any event, we have assumed that under the International's constitution it could have taken a more active role with respect to the charges of hiring hall retaliation had it chosen to do so. Notwithstanding the dissent's belief that the International has the legal obligation to intervene to rectify every possible abuse by the locals, no language in the constitution suggests the International has made such an undertaking.
 
 
 40
 We are reluctant to anchor new signals in uncharted waters. Imposing upon an international union the legal obligation to protect local union members from allegedly abusive tactics by local officers could alter the delicate balance between local unions and their internationals, to the sacrifice of local union independence. Although the dissent has made evident its discomfort with Congress' authorization of union administration of hiring halls, any obligation this court were to impose on the International based on the broad language of the preamble to its constitution would be equally applicable to members' complaints outside the hiring hall context. If such a new policy is to be formulated, its benefits and detriments are matters to be evaluated by Congress. It is sufficient for this purpose for us to conclude that the law, in its present state, does not support the contractual obligation which the dissent would find from the language in the International's constitution.
 
 
 41
 It follows that, in the absence of a specific undertaking, the International cannot be held liable for a breach of contract and the district court did not err in granting summary judgment for it on the NLRA claim.[8]
 
 B.
 Applicable Limitations Period
 
 42
 Turning now to the section 301 claim against the Local Union, plaintiffs argue that the district court erred as a matter of law in holding that the six-month limitations period found in section 10(b) of the LMRA applied to their breach of the duty of fair representation claim against the Local. They assert that the applicable limitations period is instead either Pennsylvania's two-year limitations period for fraud and other personal injury actions, 42 Pa.C.S.A. Sec. 5524 (1981 and Supp.1990), or its four-year limitations period for most breach of contract actions, 42 Pa.C.S.A. Sec. 5525 (1981 and Supp.1990).
 
 
 43
 In DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Court held that the six-month limitations period found in section 10(b) of the LMRA for making charges of unfair labor practices should be applied to a hybrid action under section 301 by an employee against both his employer and his union. In that case, the section 301 case was based on an allegation that the employer breached the collective bargaining agreement and the union breached its duty of fair representation in mishandling the ensuing grievance and arbitration proceedings. The Court held that, notwithstanding the general rule of applying the most closely analogous state statute of limitations when federal law is silent on the question of limitations, "[i]n some circumstances ... state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law. In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." Id. at 161, 103 S.Ct. at 2289.
 
 
 44
 The Court found that the typically short state limitations periods of 90 days for vacating arbitration awards failed to provide an aggrieved employee with an adequate opportunity to vindicate his rights under section 301 and the fair representation doctrine, while the longer state limitations periods for legal malpractice would preclude the relatively rapid resolution of labor disputes favored by federal policy. Finding no appropriate state statute of limitations, the Court applied the section 10(b) limitations period because Congress found it to be the proper balance of the tension between the "national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective bargaining system." Id. at 171, 103 S.Ct. at 2294 (quoting United Parcel Service v. Mitchell, 451 U.S. 56, 70, 101 S.Ct. 1559, 1568, 67 L.Ed.2d 732 (1981)). Nonetheless, the Court expressed the following caution:
 
 
 45
 We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that the federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy.
 
 
 46
 Id.
 
 
 47
 Thereafter, this court applied the reasoning and holding of DelCostello to labor claims arising in a variety of contexts. In Local Union 1397 v. United Steelworkers of America, 748 F.2d 180 (3d Cir.1984), a suit brought by union members against their union under the LMRDA, we held that even though a different statute was at issue, the six-month limitations period should be used because suits brought under section 102 of the LMRDA bear a "family resemblance" to unfair labor practice charges in that both are concerned with the protection of individual employees from arbitrary action by their unions. Id. at 183. We declined to apply a longer state limitations period, reasoning that "rapid resolution of internal union disputes is necessary to maintain the federal goal of stable bargaining relationships, for dissension within a union naturally affects that union's activities and effectiveness in the collective bargaining arena." Id. at 184.
 
 
 48
 We again applied the DelCostello reasoning in Taylor v. Ford Motor Co., 761 F.2d 931 (3d Cir.1985), cert. denied, 474 U.S. 1081, 106 S.Ct. 849, 88 L.Ed.2d 890 (1986), this time to a hybrid action to enforce an arbitration award. We construed DelCostello as mandating application of the six-month limitations period "to all section 301 actions that are predicated upon a union's breach of its duty of fair representation." Id. at 932. We reasoned that a breach of the duty of fair representation bears a family resemblance to an unfair labor practice, and added, "[w]herever this 'family resemblance' exists, the need for rapid resolution of labor disputes and for uniformity mandates application of the NLRA's six-month limitation period, absent some countervailing federal policy." Id. at 933.
 
 
 49
 In Lewis v. International Brotherhood of Teamsters Local 771, 826 F.2d 1310 (3d Cir.1987), we faced the issue of the limitations period that should be applied to a section 301 action that, like the case at bar, was brought by a union member against his local union under section 301 for breach of the union constitution. We stated that "the reasoning in Local 1397 as well as the holding in DelCostello govern our decision in this case," and applied the limitations period found in section 10(b). See id. at 1316. We noted that the claims "implicate[ ] the adequacy of the Local's representation of the members' interests with respect to the [company's absentee] policy and may directly affect the bargaining relationship with the employer." Id.
 
 
 50
 Shortly thereafter, in our opinion in Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123 (3d Cir.1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988), we drew a distinction for limitations purposes between those claims "normally intertwined with the day-to-day relationship between management and labor," for which the six-month section 10(b) limitations period is appropriate, and those claims which have little similarity to an unfair labor claim and where "[t]he need for speedy resolution of the dispute is therefore not present." Id. at 132-33; see also Adams v. Gould, Inc., 739 F.2d 858 (3d Cir.1984) (applying a three-year statute of limitations borrowed from ERISA for an action by former employees against their employer for underfunding their pension trust), cert. denied, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985).
 
 
 51
 The Grasty case involved a suit by union members against their unions, alleging, inter alia, that the unions had breached their respective constitution and by-laws. We relied on DelCostello, Local 1397 and Lewis in applying the six-month limitations period to those claims that related to the union's role as the exclusive bargaining representative, i.e., claims that it had fraudulently engineered a strike vote, failed to pursue grievances of second-shift employees and discharged workers, failed to protest an increase in medical deductions, allowed the local union to fall into chaos, and failed to conduct elections. Id. at 131. However, we held that the four-year state statute for breach of contract applied to the union members' claims that the union failed to rebate dues and improperly charged disabled workers, because the need for the speedy resolution of such disputes was not present inasmuch as those claims had little or nothing to do with the day-to-day relationship between the local union and its members on one hand and their employer on the other. Id. at 133.
 
 
 52
 In a sense, Grasty can be viewed as anticipatory of the recent significant development in the law of limitations effected by the Supreme Court's decision last term in Reed v. United Transportation Union, 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). In Reed, a union member brought suit against his union and its officers pursuant to the LMRDA alleging interference with his section 101(a)(2) right to free speech as to union matters. Summary judgment turned on the applicable limitations period. The Court, emphasizing "the narrow scope of the DelCostello exception to [the] standard borrowing rule," id. at 326, 109 S.Ct. at 626, held that DelCostello was inapplicable because an internal union dispute can have only an indirect impact on the economic relations between a union and an employer and on labor peace. Id. at 330-31, 109 S.Ct. at 628-29. The Court reaffirmed the general rule that the most closely analogous state limitations period should be applied to a cause of action when no federal limitations period is provided. Id. at 327, 109 S.Ct. at 627.
 
 
 53
 It is significant for our purposes that the Court expressly rejected the rationale underlying our decision in Local 1397 where we held that the six-month limitations period should apply to a LMRDA claim because dissension within a union naturally affects the union's activities and effectiveness in the collective bargaining arena. Id. at 330-31, 109 S.Ct. at 628-29. While the Court found that this observation does have some plausibility, it held that the federal interest in union democracy, which is promoted by union members' free speech and assembly rights, favors the application of the longer state limitations period. Id.
 
 
 54
 Decisions rendered after Reed have applied state limitations periods to LMRDA claims, Clift v. International Union, 881 F.2d 408 (7th Cir.1989), and to claims alleging that a union breached its by-laws and its constitution by misrepresenting the size of its membership and failing to place plaintiff in the position of business representative to which he was elected. Pruitt v. Carpenters' Local Union No. 225, 893 F.2d 1216 (11th Cir.1990). The Pruitt court noted that plaintiff had not brought a hybrid suit, attacked the validity of a collective bargaining agreement, or intermeddled with a settled arbitration award. Id. at 1221.
 
 
 55
 The Local, seeking to uphold the district court's application of the six-month limitations period to the plaintiffs' claims under section 301, argues that these claims bear a family resemblance to unfair labor practice claims. The Supreme Court rejected this argument in Reed, however, for it expressly found that even though the plaintiff's claims might bear a "family resemblance" to an unfair labor practice claim, such a resemblance would be inconclusive. 488 U.S. at 333 n. 7, 109 S.Ct. at 630 n. 7. Moreover, this court's application of the six-month limitations period to a section 301 claim in Lewis was controlled by Local 1397, a holding clearly rejected by Reed. We are therefore not only free to re-examine Lewis, we are bound to do so in light of Reed.
 
 
 56
 The Supreme Court's message in Reed was that the interest in the rapid resolution of labor disputes does not outweigh the union member's interest in vindicating his rights when, as here, a dispute is entirely internal to the union. Because the present dispute between the plaintiff union members and their union and its officials can have no more than an indirect influence on the union's ability to negotiate effectively with those employers who hire carpenters through the hiring hall, we conclude that the rationale behind DelCostello's narrowly circumscribed exception is inapplicable. It follows that to the extent summary judgment on plaintiffs' section 301 claims was based on the six-month statute of limitations, the order must be reversed. On remand, the district court should apply the most closely analogous Pennsylvania statute of limitations to the plaintiffs' section 301 claims. We leave for the district court to determine in the first instance which state limitations period applies, because the parties have not fully briefed and argued that issue before us.
 
 C.
 Continuing Violation
 
 57
 Because some of the acts complained of by the plaintiffs occurred more than two or four years before the suit was filed, our decision that a longer state statute of limitations applies to plaintiffs' section 301 claim does not obviate our need to consider their contention that the Local's conduct constituted a continuing violation. The district court gave short shrift to plaintiffs' contention, stating without further elucidation, "we find plaintiffs' reliance on the 'continuing violation' theory to be misplaced." App. at 217 n. 6. Plaintiffs' argument merits more extended analysis.
 
 
 58
 In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred. Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1129 (3d Cir.1988).
 
 
 59
 Plaintiffs argue that the failure of the local union and its agents to refer them for work through the hiring hall in a fair manner from 1979 or thereafter until 1986 constituted the type of ongoing practice to which the continuing violation doctrine should be applied. They urge us to follow the lead of Lewis v. Local Union No. 100, 750 F.2d 1368, 1378 (7th Cir.1984), where the court concluded that the continuing violation theory applied to a similar claim by a union member against his union for maliciously refusing to refer him out of the hiring hall. In holding that the claims were not time barred because plaintiff had alleged an ongoing course of conduct by the union of repeatedly refusing to refer him out for employment, the court explained, "[plaintiff] alleges a continuing course of conduct motivated by personal animosity, not one particular instance in which, for example, the Union failed to process a grievance concerning a discharge or promotion." Id. at 1379. We find the Lewis court's reasoning persuasive.
 
 
 60
 The Local Union contends that under the plaintiffs' theory no limitations period would ever apply to their claims. It relies on our decision in NLRB v. Pennwoven, 194 F.2d 521 (3d Cir.1952), where we held that the NLRB was time barred from issuing an untimely unfair labor practice charge against an employer who failed to rehire laid-off workers based on seniority because of anti-union animus. In Pennwoven, we rejected the Board's contention that the company's failure to reinstate the workers constituted a continuing violation, holding that under that reasoning the employees' case would never be closed until it was finally litigated. Id. at 525.
 
 
 61
 Pennwoven is inapposite in that it involved a discrete act, failure to reinstate, from which the limitations period could run. In contrast, in this case the plaintiff union members have filed affidavits supporting their allegations that they made multiple requests for employment and were subjected to repeated hostile acts committed by Blazejewski during the period of discrimination. This evidence supporting the allegation of a continuing course of conduct constituting a violation of the union's duty of fair representation is sufficient to warrant the application of the continuing violation theory to plaintiffs' claims.
 
 
 62
 The Local argues that those union members who withdrew from or were terminated by the union more than two or four years before this suit was filed should not be able to take advantage of the continuing violation theory. See note 3, supra. Plaintiffs respond that Blazejewski's continuing presence in the union deterred them from re-entering the union. However, as the Supreme Court stated more than a decade ago in rejecting an analogous argument seeking to equate present effect with a continuing violation, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (emphasis in original); see also United Air Lines, Inc. v. Evans, 431 U.S. 553, 557-58, 97 S.Ct. 1885, 1888-89, 52 L.Ed.2d 571 (1977) (allegation that employer's seniority system "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination" is insufficient to establish a continuing violation).
 
 
 63
 In almost all instances, Blazejewski's discriminatory acts against the plaintiffs will have ceased when they forfeited their union status because they were no longer eligible for referral through the hiring hall. Therefore, the applicable statute of limitations began to run against each union member plaintiff no later than the date he withdrew from the union, unless a particular plaintiff can show that Blazejewski affirmatively acted to prevent him from regaining his status as a union member.[9] On remand, the district court will have the opportunity to apply the principles set forth here to the facts of record as to each plaintiff.
 
 III.
 THE LMRDA CLAIMS
 
 64
 Plaintiffs also appeal from the district court's grant of summary judgment for the defendants on plaintiffs' LMRDA claim. The district court held that based on the reasoning of the Supreme Court in Breininger v. Sheet Metal Workers International Association Local Union No. 6, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), plaintiffs failed to establish that they were "otherwise disciplined" within the meaning of the LMRDA. On appeal, plaintiffs assert merely that they have alleged and adduced in discovery sufficient facts to show official, collective activity to support remand to the district court for trial on this issue.
 
 
 65
 Section 101(a)(2) of the LMRDA guarantees to every union member the right to "express any views, arguments, or opinions[ ] and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." 29 U.S.C. Sec. 411(a)(2) (1982). Section 609 provides:
 
 
 66
 [i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this [Act].
 
 
 67
 29 U.S.C. Sec. 529 (1982) (emphasis added).
 
 
 68
 In Breininger, the Court interpreted the phrase "or otherwise discipline" in the context of an LMRDA claim alleging that union officers had engaged in discriminatory hiring hall practices. In concluding that the union member had failed to state a claim under the LMRDA, the Court stated:
 
 
 69
 [W]e find that by using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules.... The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership."
 
 
 70
 110 S.Ct. at 438-39. As further support for its conclusion that coercion, intimidation, and economic reprisals by union officers do not constitute "discipline" within the meaning of section 609, the Court referred to the legislative history of the Act:
 
 
 71
 the fact that even in an earlier bill improper discipline by a labor organization was listed separately from economic coercion by any person shows that the Senate believed that the two were distinct, and that it did not intend to include the type of unauthorized "economic reprisals" suffered by petitioner in the instant case in its definition of "discipline." ... Discipline "must be done in the name of or on behalf of the union as an organizational entity."
 
 
 72
 Id. at 440 (emphasis in original) (quoting Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv.L.Rev. 727, 732 (1969)). Thus, because the union member in Breininger alleged only that the union business manager and business agent failed to refer him for employment in retaliation for supporting one of their political rivals, the Court held that he failed to state a claim under the LMRDA. Id.
 
 
 73
 Defendants argued, and the district court agreed, that this case is indistinguishable from Breininger because the union members failed to allege acts by the union acting in its official capacity and instead raised only ad hoc retaliations by the individual union official. We agree. Moreover, the allegation that the International Union "whitewashed" Blazejewski by conducting investigations but failing to take any actions to eliminate the discrimination does not transform the International's inaction into "discipline" within the meaning of the LMRDA. It follows that the district court did not err in holding that the plaintiffs have failed to present evidence sufficient to withstand summary judgment under section 609 of the LMRDA.
 
 
 74
 Arguably, the complaint, which alleges that the defendants acted with the intent to deprive plaintiffs of their rights under the LMRDA and requests that the court restrain and enjoin the defendants from interfering with the exercise of those rights, can be read broadly to assert a claim under section 102 of the LMRDA. That section provides a cause of action to any person whose rights secured by the provisions of Title I of the LMRDA have been infringed by any violation of Title I. Sections 101(a)(1) and (a)(2) provide union members with the right to freedom of speech and assembly and the right to vote in union elections. See M. Malin, Individual Rights Within the Union 50, 64, 67-68 (1988) (section 101(a)(2) protects internal union political activity and gives union members the right to discuss union affairs and say what they think).
 
 
 75
 In Breininger, the Supreme Court stated that it was not determining whether the union member had successfully stated a claim that certain of his rights secured by the LMRDA were infringed by the union officers' conduct in violation of section 102. 110 S.Ct. at 440 n. 18. In Guidry v. International Union of Operating Engineers Local 406, 907 F.2d 1491 (5th Cir.1990) (Guidry II ), a case also involving a claim that plaintiffs' union violated their rights under the LMRDA by manipulating the hiring hall procedures in discrimination against plaintiffs for opposing union incumbents, see Guidry, 882 F.2d 929, 933-36 (5th Cir.1989) (Guidry I ), vacated, --- U.S. ----, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990), the court held that even though the plaintiffs had failed to allege that they had been "disciplined" under section 609 of the Act, Breininger did not preclude the plaintiffs' cause of action under sections 101(a)(1) and 102. "A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful 'discipline' is shown." Guidry II, at 1493.
 
 
 76
 Further support for such a claim under section 102 can be found in Sheet Metal Workers' International Association v. Lynn, 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989). In that case, an elected business agent who alleged he was removed from his position in retaliation for statements he made at a union meeting was found to have stated a claim under sections 101(a)(2) and 102 of the LMRDA because forcing him to choose between his post and exercising his rights as a union member "infringed" his rights within the meaning of the LMRDA. Id. at 354, 109 S.Ct. at 644. The Court also noted that the plaintiff's removal had a potential chilling effect upon the rights of the other union members. Id. at 355, 109 S.Ct. at 645. Plaintiffs in this case might have analogized Lynn's situation to theirs in light of their allegations that they were forced to choose between job referrals and exercising their rights.
 
 
 77
 We are, however, unable to reverse the grant of summary judgment on the LMRDA claim because plaintiffs' briefs filed in this court do not argue that their claim survives as a section 102 claim nor did they so argue in the district court. It is well established that failure to raise an issue in the district court constitutes a waiver of the argument. See Toyota Indus. Trucks v. Citizens Nat'l Bank, 611 F.2d 465, 470 (3d Cir.1979); see also Lugar v. Texaco, Inc., 755 F.2d 53, 57 n. 2 (3d Cir.1985). Moreover, the federal and local rules of procedure requiring the appellant's brief to include a statement of the issues presented for appeal, see Fed.R.App.P. 28(a)(1)(3); Third Circuit Rule 21(1)A(d), would be without significance were we to countenance failure to include an issue, absent extraordinary circumstances. No such circumstances appear here, and there is no reason to relieve plaintiffs from their waiver, particularly because they did not make the section 102 argument in the district court. We will therefore affirm the grant of summary judgment on the LMRDA claim.
 
 IV.
 CONCLUSION
 
 78
 We have held that the plaintiffs have failed to show any basis to withstand summary judgment for the International on the section 301 claim, that the district court erred as a matter of law in granting summary judgment for the local unions on the section 301 claim on the ground of the six-month statute of limitations, that those plaintiffs who remained in the union may make use of the continuing violation doctrine, and that the district court did not err in granting summary judgment for the defendants on the LMRDA claim.
 
 
 79
 For the foregoing reasons, we will affirm the district court's grant of summary judgment in favor of the International Union and affirm in part, reverse in part, and remand the district court's grant of partial summary judgment in favor of the Local Union for further proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 80
 ROSENN, Circuit Judge, concurring in part and dissenting in part.
 
 
 81
 I join in the majority's opinion in all respects except for its failure to reverse the district court's grant of summary judgment in favor of the United Brotherhood of Carpenters and Joiners of America (the "United Brotherhood" or "International") on the plaintiffs' section 301 LMRA claim. As to that issue, I respectfully dissent.
 
 I.
 
 82
 Significantly, this case does not involve the situation where an employer or some third party, to whom an international union has no formal or contractual relationship and owes no duty, attempts to impose liability on the international union for the illegal acts of its local union members. Such suits are common in wildcat strikes or when a local union authorizes a strike and its members engage in violent or other illegal activity or when the local and its membership engage in a strike for an illegal purpose which may harm the employer or third parties unrelated to the dispute. In such situations, courts approach the question of an international's liability cautiously.
 
 
 83
 In contrast, this case involves purely intra-union conduct, implicates an international's relationship with and obligation to its members, and as such invites closer judicial scrutiny. Unlike the typical situation where the employer and a union engage in collective bargaining and each is armed with powerful weapons for that purpose, the ordinary members of a local union are relatively defenseless in a dispute with the local. The union members' only means of checking the local officials' misconduct is the ballot, generally at an election held every three or four years. By that time, the members' opportunity to earn a livelihood may be at risk; they may face economic extermination unless they can obtain speedy redress from the international union or the courts. When the international union rejects their importunings, the last hope of relief rests with the courts.
 
 
 84
 With the passage of the 1947 Taft-Hartley amendments to the National Labor Relations Act, Congress made an extraordinary exception for building and construction unions, entrusting to them the power to establish and control non-discriminatory exclusive hiring halls. See 29 U.S.C. Sec. 158(f). The characteristic feature of a hiring hall arrangement is that a union can select from among its members those workers to fill employment needs, the "keystone of this arrangement [being] the employer's abdication of the selection process to the union." 73 ALR Fed. 171, 177, n. 2 (1985). Although these amendments to the Act permitted the limited continuation of exclusive union hiring halls in the building and construction industry, Senator Taft, sponsor of the bill, voiced his concern over the extraordinary power which such arrangements gave the unions, when he stated,
 
 
 85
 [An exclusive hiring hall arrangement] gives the union tremendous power over the employees; furthermore, it abolishes a free labor market. A man cannot get a job where he wants to get it. He has to go to the union first; and if the union says that he cannot get in, then he is out of that particular labor field. Under such circumstances there is no freedom of exchange in the labor market, but all labor opportunities are frozen.
 
 
 86
 See Cong.Rec., Senate, April 23, 1947, p. 3952 (quoted in 38 ALR 2d 413, 415, n. 5).
 
 
 87
 The hiring hall removed the carpenters' right to work from their own hands and placed it in the hands of union representatives. With such extraordinary power necessarily went grave responsibilities.
 
 
 88
 The majority concludes that the plaintiffs have failed to demonstrate specific facts showing that there is a genuine issue for trial regarding the liability of the United Brotherhood. Majority Op. at 1291. I respectfully disagree. I believe the record is replete with evidence from which a jury reasonably could infer that the United Brotherhood breached its obligations under the union constitution and, alternatively, supported, ratified, or otherwise encouraged the local union in its breach of the duty to represent the union members fairly. Although it had the power and duty under its constitution to step in and correct the alleged abuses, the International for seven years did nothing to aid its members. On the contrary, there is evidence from which a jury could infer that the International guilefully led the members to believe it was endeavoring to be helpful while it allowed, encouraged and by its steadfast silence even supported the abuses. It is said that actions speak louder than words; inaction may sometimes be far more eloquent.
 
 II.
 
 89
 Because the factual underpinnings underlying the plaintiffs' complaint are critical to determining whether there exists a disputed issue of fact as to the United Brotherhood's breach of its constitution or as to its encouragement and support of the abuses employed by its subordinate officials, it is necessary to review them in some detail. Defendant Keystone District Council ("Council"), a subordinate unit of the United Brotherhood, periodically entered into collective bargaining agreements on behalf of its members with builders and other prospective employers in the building and construction industry to provide them workers through a hiring hall system. Customarily, union carpenters whose names have been on the hiring hall list for the longest period of time are referred to an employer who requests workers. For the period between 1979 and 1986, Local 514's business agent Edward Blazejewski, Sr., (Blazejewski) controlled the assignment of the plaintiffs to work through the hiring hall system. The twenty-seven plaintiff carpenters and their wives allege that between 1979 and 1986, Blazejewski wielded his power over the hiring hall to retaliate against those union members who opposed him politically and who attempted to exercise their rights of free speech and political expression in the union.
 
 
 90
 The International eschews any responsibility for Blazejewski's allegedly abusive conduct, claiming that it was unaware of such abuses. Consistent with the International's posture of perpetual denial throughout the duration of plaintiffs' battle with Blazejewski, at oral argument its counsel contended that the United Brotherhood was not advised of the carpenters' complaints of hiring hall abuses until 1986. Notwithstanding counsel's straightforward disavowal that the United Brotherhood had no notice of hiring hall abuses prior to 1986, I believe the evidence in the record on this point is unequivocally to the contrary. Indeed, evidence shows that the United Brotherhood early had actual notice of the abuses complained of by the plaintiff carpenters.
 
 
 91
 In 1979, Local 514 utilized illegal marked ballots in the election of the business agent and other union officials, and many of the plaintiffs voted against Blazejewski, his son, and other Blazejewski-supported candidates. Thereafter, some plaintiffs complained to the United Brotherhood about the marked ballots and their fears of reprisal from Blazejewski, Sr., for voting "the wrong way." John Anello, representing the International and the General President, dispatched to investigate abuses at Local 514 from 1982 to 1986, admitted that, although there was an appeal from the illegal election to the International, it did not invalidate the election; it did nothing to protect the union members who had voted against Blazejewski's son. At his deposition, Anello acknowledged that a vindictive business agent could use the marked ballots as a means of identifying opposition members and refusing to refer them to work. Nevertheless, Anello was unaware of any follow-up by the International to ensure such a situation would not occur.
 
 
 92
 The majority discounts the relevance of the 1979 marked ballot election to the issue of retaliatory hiring hall discrimination. Majority Op. at 1290. To the contrary, this illegal election identified many of the plaintiffs as opposing Blazejewski and is wholly relevant to their alleged injury from and provided the motivation for the ensuing retaliatory discrimination. The International's failure to rectify the illegal election of Blazejewski, in clear contravention of its constitution and by-laws, is also relevant to the question of the International's ratification of the hiring hall discrimination; its inaction reasonably may have sent a "green light" to Blazejewski that the International would not interfere with Blazejewski's treatment of the opposition carpenters. The majority's attempt to dissociate the two events--the sanctioned illegal election and the subsequent non-censured retaliation--constitutes an unnatural departure from the evidence in this case.
 
 
 93
 Following another election in 1982 in which Blazejewski's son was defeated, the opposition carpenters sent renewed complaints to the United Brotherhood. According to plaintiff Eugene Cardoni's affidavit, agent Blazejewski boasted that all who had openly opposed his son in the election would never obtain work again after being laid off. Cardoni himself received no work referrals after being laid off in 1983. Once again, affidavits in the record reveal that written petitions by the members to the United Brotherhood failed to yield any results. Although the majority, see opinion at 1290, appears to pay little weight to the significance of plaintiffs' affidavits, even in the context of opposition to a motion for summary judgment, affidavits which bear the indicia of reliability are, of course, wholly applicable to the disposition of a summary judgment motion and should be carefully scrutinized by the court.
 
 
 94
 The majority suggests that the complaints of the union members failed to focus sufficiently on the hiring hall retaliation but treated them in a subordinate manner to other grievances. I disagree. The presence of separate grievances in the plaintiffs' letters in no way diluted the potency of their complaints regarding the abuses in the work referral system. Nor did they reduce their efficacy in giving notice to the International. Moreover, this court should not expect the union carpenters to have prepared and presented their complaints to their International Brotherhood concerning their lack of work with the clarity, exactitude, and precision required in an old common law proceeding.
 
 
 95
 Furthermore, I fail to see the relevance of references to other grievances to the issue here. The International did respond effectively to some of these other complaints, such as the charge that Blazejewski had abused a union fund. If relevant at all to the issue of the International's encouragement or ratification of hiring hall abuses, its effective intervention in response to one set of complaints contributes to the conclusion that the International's failure to intervene in another context constituted implicit affirmance of the misconduct. Indeed, it would support a finding by a jury of ratification or encouragement.
 
 
 96
 The majority does not dispute that some of the plaintiffs' letters to the International unequivocally addressed the hiring situation in a clear, focused and poignant manner. Plaintiff Albert Pavlick's letter grievance of January 26, 1983, was one such letter. Pavlick, a millwright, complained to the General President of the United Brotherhood about agent Blazejewski's refusal to refer Pavlick out to work after Pavlick campaigned for an opposition candidate to Blazejewski as business agent. Pavlick informed the General President that after two years of no work referrals he finally spoke to Blazejewski directly, asking him about when he might receive work through the hiring hall. Blazejewski's response, which Pavlick related to the General President, was, "You'll know when I call you." Pavlick also informed the Brotherhood President that he was "not the only one Eddie [Blazejewski] had discriminated against," and stated, "Right now there are three guys who haven't worked at all for almost a full year...." Pavlick concluded his letter with a stirring plea for help, asserting that several of the discriminated members were losing their homes for lack of work, and that he believed that he had "paid [his] debt for not voting for Ed Blazejewski as Business Agent." In a postscript to his letter, Pavlick declared, "I know many men who will tell you their stories of discrimination if only someone is willing to listen." (Emphasis added).
 
 
 97
 Following Pavlick's grievance, a meeting was set up between Pavlick, Blazejewski, and the International's representative Anello. According to plaintiff Gerald Siperko's affidavit, Anello refused to listen to the carpenters' complaints about the hiring hall but, in Siperko's words, "dismissed us by commenting to Joe Novitsky, 'as big as you are you shouldn't have any problems.' " There is no evidence in the record that Anello or the International took any action whatsoever following this meeting.
 
 
 98
 Plaintiff John Zimnicky alleges in his affidavit that at about the same time he spoke with another International representative about Blazejewski's misuse of the hiring hall but that the representative did nothing. In another incident reported by plaintiff Nicholas Kovalchik, a former member and local union trustee, one carpenter tried to press charges against Blazejewski for his refusal to authorize that union member's health benefits. According to Kovalchik, at a meeting attended by Anello, the International representative, Blazejewski attacked the complaining carpenter by grabbing his throat and pushing him up against a wall. Kovalchik further averred that the International never disciplined nor reprimanded Blazejewski for hiring hall abuses despite numerous pleas over many years and meetings with the International's representatives.
 
 
 99
 The record shows that on January 3, 1984, plaintiff Siperko wrote the General President of the United Brotherhood to complain about Blazejewski's refusal to refer Siperko and thirty-nine other carpenters to work in an effort to "starve out" his opposition. Siperko also wrote to the NLRB and the Senate Labor Committee complaining of unfair work referrals. On December 31, 1984, plaintiff Zimnicky wrote the General President complaining about Blazejewski's misuse of a union fund and his discriminatory treatment of the opposition carpenters. Zimnicky's letter, signed by over twenty-five union carpenters, charged the International with protecting Blazejewski, asserting that it "has condoned Blazejewski's illegal actions every time we brought them to your attention--enhancing his position and encouraging further corruption. For Blazejewski's 'administrative convenience' [the United Brotherhood] has again chosen to condone gross violations of our rights." (Emphasis in letter).
 
 
 100
 The only result the plaintiffs received from persistently exercising their union right to petition the United Brotherhood was repeated abuses from Blazejewski and repeated denial of work opportunities. Aware of Blazejewski's willingness to punish those who complained to the International and the need to preserve the complainants' anonymity, someone, presumably a plaintiff, wrote the words "Don't Copy," prominently at the top of Zimnicky's letter grievance signed by many of the aggrieved carpenters.[1] Indeed, the courage and persistence of these men and their families is remarkable. From their years of experience with Blazejewski, they must have known that by airing their grievances with the International they risked further reprisals from the business agent. Such courage in the face of Blazejewski's demonstrated willingness to crush his opposition underscores the appalling nature of the United Brotherhood's failure to intervene on behalf of those who placed their trust in the International. Despite the International's inaction, the letters kept coming.
 
 
 101
 In utter desperation, Zimnicky's wife Jean wrote on July 9, 1985, to another officer of the United Brotherhood to complain about Blazejewski's discriminatory hiring practices. In that letter, she protested,
 
 
 102
 What does it take to get your attention? ... Right now, Eddy Blazejewski is sending retired, pensioned members to work at the RCA job at Keystone Industrial Park, Dunmore--while 60 dues paying members are unemployed. A few of these men have not been offered work by Blazejewski in two years, many others in more than a year. [Several union officials] told my husband and others than no-one from the International ever contacted or questioned the officers of Local 514 about a single complaint made against [Blazejewski].
 
 
 103
 Thereafter, at the start of 1986, Mr. Zimnicky wrote the United Brotherhood stating that the Council had no hiring rules and again complaining about Blazejewski's "hiring practices and his brazen contempt for the law." Other plaintiffs continued to write the International with complaints about similar hiring hall discrimination.
 
 
 104
 Thus, the United Brotherhood's contention that it had no notice of hiring hall discrimination until 1986 is glaringly refuted by the deluge of letters sent by the plaintiffs and by numerous documents in the record. Indeed, not only did the United Brotherhood know of these alleged abuses, but it repeatedly sent Anello seemingly to investigate complaints beginning as early as 1981 or 1982. Nevertheless, there is no evidence in the record that the International did anything to admonish or sanction Blazejewski or rectify the hiring hall situation. Instead, the International adopted a course of utter silence, which could only have encouraged Blazejewski and affirmed his conduct with respect to his mistreatment of the plaintiff carpenters, until after Blazejewski's retirement in 1986. This led an exasperated Zimnicky to write the following to Anello on April 7, 1986:
 
 
 105
 You've been investigating complaints from Local 514's members for several years, during which a bad situation grew steadily worse. Al Pavlick told you in 1982 when you were investigating his grievance that we had no hiring rules; you've known that for years. In spite of continued complaints about B.R. Blazejewski's unfair hiring practices you made no attempt to resolve the problem. You could have recommended at any time that the Local adopt hiring rules. Instead, you spent 2 or 3 hours in private with B.R. Blazejewski for every 10 or 15 minutes you spent with anyone who filed a complaint against him. You refused to even talk to witnesses to complaints filed against him by individual members.
 
 
 106
 (Emphasis added). In the same letter, Zimnicky charged representative Anello with making the following statement:
 
 
 107
 On January 3, 1985, you told the officers of Local 514, "Those troublemakers are nuts if they think they'll get anywhere complaining to the General Office. Incumbent Business Agents have all the power of the union to back them. The United Brotherhood has eighty million dollars. Those troublemakers can sue if they want to."
 
 
 108
 At his deposition, Anello would discuss only in general terms his handling of grievances filed by the union members. He asserted that, to elicit a response from the International, the union members simply had to write a letter to the General President, who would assign a representative to investigate the complaint. He stated that he understood his role in the grievance process to be conciliatory, "to get people to work together," rather than fault-finding and to help the parties "bury the hatchet." However, Anello asserted that he knew he had the power to discipline union business agents if they violated the union constitution. Anello reported back to the General President of the United Brotherhood after every assignment he received. However, Anello produced no record, letter, written report, or other document regarding his "investigations" of the hiring hall abuses; nor could he even recall any specific action taken by himself or the General President of the United Brotherhood prior to Blazejewski's retirement to alleviate the hiring hall discrimination. During his deposition, Anello claimed that he could not recall how Blazejewski had handled the work referrals--even though Anello handled many of these grievances between 1982 and 1986.
 
 
 109
 Even after his retirement as business agent, Blazejewski wrote a letter in November 1986 to Anello regarding the request of former union member Eugene Cardoni to be reinstated with the union. In that letter, Blazejewski advised Anello that Cardoni had brought this lawsuit against the union and that "any action you take on Cardoni's request may have an effect on this lawsuit." Furthermore, Blazejewski confided, "I believe this request [for reinstatement] is only the first of many like it that will soon follow. I would be willing to speak 'off the record' to you about some of these matters any time you would like." Only a person supremely confident of his past intimate relationship[2] with the International representative would have the temerity to write a letter at this point still endeavoring to perpetuate his control over the carpenters.
 
 III.
 A.
 
 110
 The International's failure to intervene in response to its members' repeated supplications might not invite liability if indeed it lacked the control over Blazejewski to step in and correct the abuses. However, Anello's and the International's consistent failure to come to the aid of its grieving members and to discipline the formidable Blazejewski stands in stark contrast to the constitutional powers and duties of the United Brotherhood. These powers were granted in pursuit of the stated union objective to "elevate the moral, intellectual and social conditions of all [its] members and to improve the trade in every way possible." Union Constitution Sec. 2.
 
 
 111
 According to the International's constitution, the United Brotherhood's authority over its subordinate local unions and district councils is fundamental and far-reaching. The International controls the very existence of these subordinate bodies, retaining the power to "establish or dissolve any Local Union or Council" where the "General President finds that it is in the best interests of the United Brotherhood and its members." Union Constitution Sec. 6A. In addition, the United Brotherhood guarantees that when exercising its power to establish, dissolve, or merge subordinate union entities, the "vested rights of the members shall be preserved."[3] Union Constitution Sec. 6A (emphasis added). These rights include the right to attend and participate in meetings, to vote, to nominate candidates and to be nominated and run for office or business representative, Union Constitution Sec. 6A, the exercise of the very rights which are the genesis of the issue in this case. The constitutional recognition of the right to vote and participate in union meetings implicitly includes the right to do so without coercion, intimidation, or retaliation.
 
 
 112
 To implement its broad plenary powers over the local unions and its power to protect member's vested rights, the constitution grants the International the right to "regulate and determine all matters pertaining to the various branches and subdivisions of the trade." Union Constitution Sec. 6B. In contrast, the governing authority of the subordinate local unions only extends to making such laws "which do not conflict with the laws of the International Body." Union Constitution Sec. 6C. More specifically, the International possesses the right "to protect the interests and rights of the members whenever the affairs of the subordinate body are conducted in such a manner as to be detrimental to the welfare of the members." Union Constitution Sec. 6D (emphasis added).
 
 
 113
 In addition, the constitution requires the United Brotherhood to enforce the laws which govern it and its subordinate bodies: "The United Brotherhood shall enact and enforce laws for its government and that of subordinate Locals and Auxiliary Unions and District, State and Provincial Councils and members thereof." Union Constitution Sec. 6E (emphasis added). Obviously, one of the fundamental principles governing the conduct of the union organization is that each agent of the union must carry out his responsibilities to the union membership so as not to infringe upon the members' constitutionally-vested rights, including the obvious and basic right to work. This principle adheres in the Council's affirmation to "elevate the ... social conditions of all working men," "to assist [its] members in procuring employment and to protect [its] members ... against any injustice that may be done to them." Preamble, Union Constitution Sec. 3 (emphasis added). Here, the International failed to enforce its broad constitutional commitment to its local members.
 
 
 114
 The International also neglected to enforce specific by-laws governing Local 514. The United Brotherhood's By-Laws provide that it shall have fundamental control over the qualifications, training, nomination, compensation, election, and retirement of local business agents such as Blazejewski. United Brotherhood's General By-Laws Sec. 31. Thus, for example, the United Brotherhood's By-Laws require every local union or district council whose members are employed in the construction industry to have a full-time Executive Officer or Business Representative. United Brotherhood's General By-Laws Sec. 31C. Business Representatives must be elected by secret ballot of the union membership, serve a term of office no longer than four years, participate in training programs, and retire at age 70. United Brotherhood's General By-Laws Secs. 31(B), (C), (E), (F). Consequently, the International required Blazejewski to retire in 1986 in accordance with its General By-Laws. However, the International did little else to require Blazejewski to abide by these laws vis-a-vis his conduct toward the plaintiff carpenters.
 
 
 115
 Most significantly, the International took no action following the marked ballot election of 1979, even though such an election contravened By-Law Sec. 31(F) providing that "the election of officers and elected Business Representative(s) shall be by secret ballot." Thus, the United Brotherhood's failure to prevent reprisals against union members allegedly resulting from the marked ballot election, constitutes a breach of its duty to enforce the General By-Laws governing the locals. The union's constitution nowhere countenances any abdication of the International's law-enforcement responsibility.
 
 
 116
 This duty upon the International to exercise its plenary powers to enforce the union laws governing the local unions and to protect the members' inalienable right to work is squarely at issue in this case. International representative Anello evidenced full awareness of this duty when asked at his deposition, "You allow [the locals] to run their own affairs as they see fit?" Anello responded, "Not as they see fit; in coordination with the constitution and local bylaws." (Emphasis added).
 
 
 117
 However, contrary to defendant Anello's statement and the express language of the constitution, the majority reads this constitution not to require the International to do anything to protect the interests of its dues-paying members. Under the majority's reading, an investigation by the International of local union affairs is purely a matter of discretion, unfettered by its constitution, and therefore requires no remedial action. The majority suggests that the obligatory language placed in the constitution requiring the International to enforce laws governing the locals may relate only to a duty to enforce the structure of union government, but the majority offers no principled basis rooted in the text of the constitution or in labor law or practice for this narrow reading. Majority Op. at 1292. I believe that the union's inclusion in its constitution of the phrase "shall enforce" cannot be so lightly set aside.
 
 
 118
 Under a more generous reading, this provision in the constitution provides protection not only for the "structure" of the union in the abstract sense suggested by the majority but also assures the enforcement of laws which safeguard the vested rights of union members. The union members reasonably could have expected such protection from the International when they sought entrance into the union.
 
 
 119
 Here, the United Brotherhood's failure to enforce laws governing the election and conduct of local business representatives, "the welfare of the members," and hiring hall rules arguably constituted a breach of this constitutional provision. I do not suggest, as the majority charges, that the union constitution would require the International to "intervene to rectify every possible abuse by the locals." Majority Op. at 1292. The abuse at issue here, however, strikes at the deprivation of the union members' fundamental right to earn a living, and directly implicates the very reason for the union's existence, the fair and orderly advancement of that right.
 
 
 120
 According to the International's constitution, the responsibility to oversee the conduct of the locals generally falls upon the General President of the United Brotherhood who "shall supervise the entire interest of the United Brotherhood, and perform such duties as the Constitution and Laws of the United Brotherhood may require." Union Constitution Sec. 10G. To carry out the constitutional requirement of safeguarding members' vested rights and protecting "the welfare of the members," the General President can institute grievance procedures. Section 57 of the Union by-laws provides for the procedures whereby an aggrieved union member can appeal to the Brotherhood President. Representative Anello summed up these procedures at his deposition as follows:
 
 
 121
 Local union membership if it's got [sic] a problem goes to the local union. If it can't get the problem resolved in the local union, then if there's a council involved he could write to the council. If the council don't [sic] resolve it, then he can write to the general office [of the United Brotherhood]. When they write to the general office, one of our guys gets assigned and we go in. If he's not happy with me, he can appeal what I do to the General President.
 
 
 122
 Although Anello correctly summarized the procedures to be followed, the evidence also supports inferences that he knew of the plaintiffs' grievances and investigated them but that he and the International ignored the substance of these procedural protections. These "investigations" generally worked to Blazejewski's favor, not the plaintiff carpenters', by insulating him from further disciplinary action. Indeed, letters written by the plaintiffs to the General President and to Anello allege that Anello was biased in these investigations: spending much time in private consultation with Blazejewski and very little time with the complaining carpenters. Thus, evidence in the record, particularly when plaintiffs are given the benefit of all inferences to which they are entitled as the non-moving party, supports the conclusion that the United Brotherhood and Anello knew about Blazejewski's misconduct, but refused to do anything about it for seven years. Meanwhile, the plaintiffs were cruelly denied the opportunity of a livelihood.
 
 
 123
 The majority contends that the International took reasonable steps to investigate the allegations of hiring hall discrimination in 1983 and made a reasonable decision not to grant relief while the same claims were pending before the NLRB. Majority Op. at 1290-91. I respectfully suggest, however, that the majority is straining to read the record in the light most favorable to the party which has moved for summary judgment. The majority's attempt to depict the International's 1983 "investigation" as responsive to the plaintiff's hiring hall complaints is not supported by the record. The International has not supplied a single letter or document detailing its "investigation" of the hiring hall in 1983 or containing any formal recommendation that the International not grant relief. Indeed, the lack of description of the International's investigation of hiring hall discrimination before 1986 gives rise to a reasonable inference that these complaints were ignored or lightly brushed aside by the United Brotherhood.
 
 
 124
 Furthermore, the record supports the inference that the International and its representative recognized the improprieties in Blazejewski's hiring system. Anello's deposition demonstrates that he knew that Blazejewski's work referral system unfairly discriminated against local members. In 1986, shortly before Blazejewski's retirement, Anello again investigated the hiring hall complaints. This time he finally concluded that the United Brotherhood "should go in and make certain changes" to "reconstruct a way of referring people to work so it was fair." To avoid offending Blazejewski, however, Anello recommended that such changes should wait until Blazejewski retired and a new business agent was elected.
 
 
 125
 The International's decision in 1986 to finally rectify the unfair hiring hall situation is curious if, as the majority concludes, it had in 1983 come to the considered determination following a proper investigation that the same allegations did not warrant intervention. Although final conclusions at this stage in the litigation are necessarily partially speculative, I believe the record demonstrates that the real reason behind the International's "change of heart" over the hiring hall situation was its unwillingness to challenge Blazejewski while he was in power, not its determination that the hiring hall practices were in conformance with union laws.
 
 
 126
 Thus, the record supports that although Anello knew of the abuses in the conduct of the local's hiring hall system as early as 1982, when the carpenters first complained to him, he and the International were unwilling to act as long as Blazejewski was business agent, even though the constitution empowered and required them to take action. Anello and the United Brotherhood knew about the discriminatory work referral system, they had the power to correct it, they had the duty to correct it, they purported to investigate it, and yet they supinely did nothing.
 
 
 127
 In sum, I believe the record supports that the United Brotherhood failed over a seven-year period to enforce its constitution and by-laws regarding the powerful office of business agent, especially fair work referral rules, and to guarantee the vested rights of its brethren to vote and dissent, in contravention of the mandate contained in the union constitution.
 
 
 128
 This court may affirm the grant of summary judgment only if we determine that there is no genuine issue of fact in dispute. This record demonstrates that the plaintiffs have raised a genuine disputed issue of fact regarding the United Brotherhood's liability to the plaintiffs for breach of its constitution in violation of section 301(a) of the LMRA. This court has held that, "the International Constitution is, as a matter of law, a contract between the International and its subordinate bodies." Tile, Marble, Terrazzo, et al. v. Local 32, 896 F.2d 1404, 1414 (3rd Cir.1990). When an international's breach of contract gives rise to liability under section 301(a) of the LMRA (29 U.S.C. Sec. 185(a)), an action for this breach can be maintained by the union members themselves. See Lewis v. International Bhd. of Teamsters Local 771, 826 F.2d 1310, 1314 (3rd Cir.1987).
 
 B.
 
 129
 Alternatively, the record contains sufficient evidence to raise a disputed issue as to whether the International supported, ratified, or encouraged the alleged abusive conduct of Blazejewski and thus should share in the local defendants' liability for breach of the duty of fair representation. The majority correctly observes that the Supreme Court's decision in Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), held that, in absence of direct contractual liability, principles of common law agency apply to the question of a union's liability for acts of union members, as provided expressly in section 301(e) of the LMRA:
 
 
 130
 For the purposes of this section, in determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.
 
 
 131
 29 U.S.C. Sec. 185(e) (emphasis added). Thus, a union may be held liable for members' acts not actually authorized by it, as long as the union supported or encouraged the acts within the meaning of Carbon Fuel. As Justice Powell observed in the term following Carbon Fuel, such encouragement or support will usually be subtle because rarely does a union body broadcast its affirmance of unlawful behavior by union members. Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 418 n. 1, 101 S.Ct. 1836, 1846 n. 1, 68 L.Ed.2d 248 (Powell, J., concurring). Evidence in the record showing that the United Brotherhood knew about the alleged abuses for years and purported to honestly investigate the allegations without recommending any reforms until after Blazejewski's retirement reasonably supports the inference that the International acted in bad faith and encouraged, supported, or ratified the abuses complained of in this lawsuit.
 
 
 132
 The Supreme Court in Carbon Fuel concluded that the coal miners' union could not be said to have instigated, supported, ratified, nor encouraged the unlawful strikes simply because the union failed to use "all reasonable means available to it to prevent the strikes or bring about their termination." Carbon Fuel, 444 U.S. at 213, 100 S.Ct. at 412. As such, the Court overruled the "failure to use best efforts" doctrine as a basis of vicarious liability formerly advanced by this court and other courts. Pittsburgh-Des Moines Steel Co. v. United Steelworkers, 633 F.2d 302, 307 (3d Cir.1980). In its strong reliance on Carbon Fuel, the majority appears to blur the distinction between the discredited "best efforts theory" and the still viable doctrine of ratification.
 
 
 133
 The Supreme Court was careful to point out in Carbon Fuel that, although the union there did not exhaust all reasonable means to help end the illegal strikes, the union made a concerted effort to get the members to return to work. The Court added that there was no suggestion that the union's efforts to end the strikes were not undertaken in good faith. Carbon Fuel, 444 U.S. at 214 n. 1, 100 S.Ct. at 412 n. 1. Furthermore, the Court found justification for the union's failure to impose discipline upon the striking miners on the grounds that the union believed "such action might only aggravate a bad situation." Id. In light of the union's good faith efforts to end the strike, the Court refused to hold the union liable for this failure.
 
 
 134
 I do not share the majority's conclusion that the United Brotherhood's position finds strong support in Carbon Fuel, opinion at 1288, a case distinguishable in important respects. Unlike Carbon Fuel, here the plaintiffs allege that the International acted in bad faith in purporting to investigate their grievances over a period of years. They maintain that representative Anello displayed favoritism toward Blazejewski in the conduct of his "investigations." This allegation is bolstered by the letter in 1986 sent to Anello from Blazejewski asking for an "off the record" consultation to discuss the future of plaintiff Cardoni's union membership. A jury could reasonably infer that, unlike the presumably well-meant efforts by the union in Carbon Fuel, the United Brotherhood's investigations here were made in bad faith, that they insulated and protected Blazejewski from discipline, and that they encouraged him in his discriminatory treatment of the unsubmissive carpenters. In addition, Carbon Fuel concerned a union's legal liability to an employer, not its direct responsibility to its own members.
 
 
 135
 Consideration of common law agency principles counsels against dismissing plaintiffs' action against the United Brotherhood on summary judgment. Although local unions are legal entities distinct from the parent body,
 
 
 136
 [I]n some instances, however, the parent organization may be held liable for the conduct of its locals on theories of agency, depending on the degree of control exercised by the former over the latter, or on the relationship existing between the two unions, or, perhaps, on the theory that the international union ratified the acts of the local after they were performed.
 
 
 137
 100 A.L.R. 2d 362 (1965) (emphasis added). Well-settled principles of common law agency establish that the failure to act to repudiate an unauthorized transaction can constitute a ratification of that transaction. See Restatement 2nd of Agency Sec. 94 (1958). However, by upholding the grant of summary judgment in favor of the United Brotherhood in the face of its gross failure to act here, the majority in effect holds that failure to act can never constitute ratification.
 
 
 138
 The majority implies, see footnote 7 of the opinion at 1290, that "common law agency principles" do not encompass the doctrine of ratification by a failure to act and states that failure to act is "insufficient as a matter of law." Of course, agency principles apply to determine the International's liability, but I must vigorously disagree that agency liability always requires some affirmative word or deed. I dare say that this court has never adopted such a proposition and under Carbon Fuel it cannot do so here.
 
 
 139
 Indeed, authorities on agency law and numerous labor cases dispute the majority's novel proposition. The commentary to section 94 of the Restatement 2nd of Agency states that "silence under such circumstances that, ... one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred." Id. (emphasis added). "In the agency field," the commentary explains, "failure to object to the doing of an act has frequently been held to create authority to do future acts." Appendix, Restatement 2d, Agency Sec. 94 (case citations omitted). Unlike in Carbon Fuel, where the union repeatedly objected to the strike and instructed the miners to return to work, there is evidence in this record that the United Brotherhood never remonstrated nor objected to the market ballot election or Blazejewski's alleged hiring hall reprisals until after his retirement in 1986. A jury could reasonably find that the failure to object to these repeated abuses or to intervene to stop threatened reprisals of which the International was aware in effect constituted support or authorization by the International for Blazejewski to continue his discriminatory misconduct.
 
 
 140
 The majority charitably concludes that the United Brotherhood's alleged failure to intervene over a seven-year period despite repeated "investigations" conducted negligently or in bad faith amounts to merely "tunnel vision" on the part of the International and that it does not show encouragement of Blazejewski's conduct. Majority Op. at 1289. I respectfully submit that that conclusion is quintessentially a question for a jury. The subtle inferences to be drawn from a supervisor's failure to intervene to halt egregious conduct by one of his subordinates over an extended period of time involves the careful weighing of testimony and the assessment of the credibility of live witnesses which ordinarily should be considered by a jury.
 
 
 141
 Thus, the Restatement 2d of Agency declares that "[w]hether or not [an inference of ratification] is to be drawn is a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion." Restatement 2d of Agency, Sec. 94. Moreover, the identification of a defendant as an international union body, rather than a local body, does not alter the common law agency principles applicable under Carbon Fuel. The same principles for discerning when ratification occurs apply to both entities.
 
 
 142
 The majority concludes that the International's decision not to intervene during the pendency of certain NLRB proceedings "could not have been unreasonable." Majority Op. at 1291. First, the International's duty and response to the complaints of its members is independent of any action or lack of action by the NLRB. Nothing in the International's constitution or elsewhere suggests that the International's duty to enforce local laws and the agency principles governing the International are altered because of the independent action pursued by the labor board. Here, the particular NLRB proceedings affecting some of the plaintiffs and whatever settlements were reached as a result of those proceedings are not before this court, are not in the record before us, and we would have great difficulty drawing any conclusions about those proceedings based on this record. Secondarily, some of the charges filed with the NLRB were found to have merit. This should have been further confirmation to the International that serious wrongdoing was occurring with the local's hiring hall. Ultimately, the question of the International's reasonableness in failing to intervene to remedy the hiring hall situation should be considered by a jury.
 
 
 143
 Our sister circuit courts, when considering circumstances far less egregious than we have here, have held unions liable under the theory of ratification for their failure to intervene effectively to halt unauthorized conduct by their members. Thus, in Consolidation Coal Co. v. Local 1702 U. Mine Wkrs., 709 F.2d 882 (4th Cir.) cert. denied 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983), the court imposed liability on the local union for its failure to take effective steps to end an illegal work stoppage, declaring that, "[a] local union's inaction in the face of an illegal work stoppage by all of its members may constitute ratification of the work stoppage 'where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred.' " Id. at 886 (citations omitted).
 
 
 144
 More recently in Yellow Bus Lines, Inc. v. Local Union 639, 883 F.2d 132 (D.C.Cir.1989) vacated in part 913 F.2d 948 (D.C.Cir.1990), the court held a bus drivers' union liable for its failure to intervene to halt the malicious destruction of property by its representatives during a strike, even though the union did not "openly encourage or embrace the tactics" employed. Yellow Bus Lines, 883 F.2d at 136. There, the court concluded that the union had actual knowledge of the destructive acts but failed to investigate the allegations or curb any excesses of the strikers. The court declared,
 
 
 145
 [T]he combination of the Local's notification of events early in the strike, coupled with the complete failure to act on that knowledge, fulfills the requirement of "proof ... that the union approved the violence which occurred." ... From the Local's apparent lack of concern with the violence brought to its attention, the jury plausibly could conclude that the Local "knowingly tolerated" this state of affairs. No more is required to support a finding of ratification.
 
 
 146
 Id. (citations omitted) (emphasis supplied). Here, evidence of the United Brotherhood's "knowing toleration" of hiring hall abuses for years likewise supports the inference of ratification under common law agency principles.
 
 
 147
 Other cases since Carbon Fuel also have held unions liable for their failure to act to stop unauthorized conduct by their members. In Prater v. UMWA, 793 F.2d 1201 (11th Cir.1986), the court held that the international union was liable for its representatives' failure to do anything to halt the members' violent interference with the operation of non-union mines, because "by failing to take any action to stop the violence, [international] union officials acquiesced in or ratified the illegal activities of the union miners." Id. at 1210. See also North River Energy Corp. v. United Mine Workers, 664 F.2d 1184, 1189 (11th Cir.1981) (holding that a legitimate inference could be drawn that the local union "authorized" a strike by making a collective decision not to return to work). Similarly, in another case holding the local union liable for unfair labor practices committed by its members, the court considered relevant factors supporting liability for failure to intervene, stating:
 
 
 148
 [G]iven the length of time, the frequency of confrontations by Local 3 members with plaintiff's employees, the repeated threats, express and implied, of personal violence, ... Local 3's failure to take any action ... lends support for our conclusion that the Local, through its Executive Board, was supporting and encouraging, and authorized and ratified, the unfair labor practices....
 
 
 149
 United Tech. Com. v. Intern. Broth. of Elec. Wrkrs., 597 F.Supp. 265, 284 (S.D.N.Y.1984). Consideration of the same factors supports international union liability here.
 
 
 150
 The cases cited by the majority in support of its holding absolving the International of liability are either inapposite, easily distinguished from the instant situation, or actually support liability against the United Brotherhood. In Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372 (3rd Cir.1981) cert. denied 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982), the employer sued the international union on the grounds that it induced the local union to breach a collective bargaining agreement between the employer and the local, and this court upheld the international's liability on that basis. The majority opinion seems to imply that the court in Wilkes-Barre Publishing, by relying on the international's inducement of the breach, intended to discredit the ratification doctrine. To the contrary, this court expressly stated in Wilkes-Barre Publishing that the employer did not rely on the ratification doctrine and the court, therefore, did not need to consider it as an alternative basis for liability. Id. at 382, n. 7. Thus, I fail to see the relevance of Wilkes-Barre Publishing to the present case which squarely presents the question of union ratification of its members' illegal conduct.
 
 
 151
 Another case relied on by the majority, Chapa v. Local 18, 737 F.2d 929 (11th Cir.1984) is readily distinguished. There, the court merely held that constructive knowledge by an international union representative of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene, where the international union is a mere spectator at local meetings. In this case, where the carpenters complained directly and incessantly to the United Brotherhood, we have evidence of actual knowledge, not mere constructive knowledge, of hiring hall abuses. In addition, here we have evidence of affirmative acts committed by the International in its purportedly bad faith investigations of Blazejewski and a constitutional obligation on the part of the United Brotherhood to enforce union laws on the local level. Both are significant features absent in Chapa.
 
 
 152
 The majority's final case, Rodonich v. House Wreckers Union Local 95, 817 F.2d 967 (2nd Cir.1987), actually supports a finding of ratification by the United Brotherhood here. In Rodonich, a case like the present one involving unlawful discipline of dissenting union members, the court stated that ratification by an international union occurred where the international "affirmed the discipline imposed on plaintiffs with full knowledge that it was part of an overall scheme to suppress dissent." Id. at 973. However, after a full jury trial, the court in Rodonich concluded that there was insufficient evidence to attribute the international with such knowledge. On the other hand, in the present case evidence in the record shows that a jury reasonably could find that the United Brotherhood and its representative Anello were well aware of Blazejewski's longtime, persistent campaign to suppress dissent among the union members: the marked ballot election with evidence of subsequent reprisals is sufficient to establish such a reasonable inference.C.
 
 
 153
 Although some of the above-cited cases imposing liability on a union body considered a union's liability to an employer for ratification of members' conduct, such liability is even more justified in cases involving purely intra-union conduct, where the union's power over and duty to its membership is greater and more defined. Plaintiffs, who belong to the union, allege that they have been tortiously discriminated against by a union representative in the carrying out of his union-delegated responsibilities. Plaintiffs are dues-paying members of the International, beneficiaries of its constitution, and subject to the plenary supervisory control of the United Brotherhood. An international union's alleged breach of its responsibility toward its individual members, who have not the bargaining leverage of an employer, calls for more careful and judicious restraint in granting summary judgment for an international and its representatives then is exercised by some courts when considering the liability of an international towards an employer or third party. Indeed, this watchful approach is in keeping with the concerns expressed by the Congress which passed the Taft-Hartley amendments of 1947 to the National Labor Relations Act, promulgated as the Labor Management Relations Act of 1947, to which I have already referred.
 
 
 154
 The courts and the National Labor Relations Board have focused on redressing those hiring hall practices which restrain union members in the exercise of their rights under the Act. See 29 U.S.C. Secs. 157, 158(b)(1)(A). Thus, cases have held labor organizations liable, including internationals, for refusing to refer union members to work through a hiring hall in retaliation for their participation in intra-union dissent or other activities critical of incumbent union policies or leadership. See Farmer v. United Brotherhood of Carpenters & Joiners, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); see also 73 ALR Fed. 171, at Sec. 5(b) and cases cited therein. Other illegal hiring hall practices have also been addressed by the courts, including the failure to accord members access to hiring lists, the refusal to honor employer requests, the failure to refer workers in their proper order, and the failure to advise members of hiring hall procedures. 73 ALR Fed. 171, 181-82.
 
 IV.
 
 155
 In sum, I would hold that the plaintiffs have demonstrated a genuine disputed issue of fact both as to whether or not the United Brotherhood breached its constitutional obligation to enforce local union laws and whether or not the United Brotherhood encouraged, supported, or ratified Blazejewski's alleged discriminatory conduct.
 
 
 156
 Accordingly, I would reverse the district court's grant of summary judgment in favor of the International Union and the Local Union defendants on the LMRA claims and remand to the district court for further proceedings consistent herewith.
 
 
 
 [1]
 Hon. Dolores K. Sloviter became Chief Judge on February 1, 1991
 
 
 [2]
 A nonexclusive hiring hall is one in which the employers are free to reject persons referred by the union and may hire from other sources. R. Gorman, Basic Text on Labor Law 664 (1976)
 
 
 [3]
 The following plaintiffs resigned or were terminated from the union prior to the institution of this suit: W. Yatsko, withdrew early 1982; J. Roberts, withdrew April 1982; F. Terescavage, withdrew December 1982; D. Trotta, withdrew September 1983; M. Hardik, withdrew November 1983; A. Bronsberg, withdrew February 21, 1984; E. Cardoni, withdrew October 31, 1984; R.F. Mogavera, withdrew December 18, 1984; R. Johnson, withdrew July 17, 1985; J. Kopeza, withdrew July 1985; S. Mazur, withdrew January 21, 1986
 
 
 [4]
 The court granted summary judgment on the pendent claim against Blazejewski for interference with prospective and current contractual relations on the ground it was preempted by the NLRA and LMRDA and on the claim for intentional infliction of emotional distress on the ground that the conduct alleged was not outrageous as a matter of law. Plaintiffs do not appeal from these rulings. The district court also granted the Local's motion for summary judgment on the derivative loss of consortium claim on the ground that such damages are not available when the spouses' direct injuries are pecuniary. Plaintiffs do not contest the legal principle and argue only that if this court reinstates their LMRDA claim, this claim should also be reinstated
 
 
 [5]
 It does not appear from our reading of the complaint that Blazejewski was named as a defendant in the count alleging a section 301 claim. Thus, in the discussion on that claim the reference is to the Local and the District Council, although the district court failed to differentiate among the defendants. We treat Keystone District Council as part of the Local because it, unlike the International, has not raised the issue of its responsibility for the claims alleged by plaintiffs
 
 
 [6]
 The dissent assumes that the "Don't Copy" on the letter was written by a complainant out of fear. See Dissenting Op. at 1302. We find no basis in the record for such an assumption. Any explanation that we might offer would also be pure speculation. Moreover, the dissent's conclusion that Blazejewski had a "past intimate relationship" with the International representative Anello, see Dissenting Op. at 1304, is belied by the very letter referred to by the dissent, in which Blazejewski wrote to Anello with the following introduction: "We met briefly in St. Louis, and again in Chicago. Because of your reputation for fairness, I was glad to find you involved in this matter." App. at 736
 
 
 [7]
 This court has recently reaffirmed, albeit in the context of a wildcat strike, that common law agency principles must be applied before a local union can be found to have instigated, ratified, supported, or encouraged the strike. See Philadelphia Marine Trade Ass'n v. Local 1291, 909 F.2d 754, 759 (3d Cir.1990)
 
 
 [8]
 We have assumed throughout that the plaintiffs adequately exhausted their internal union remedies, an issue preserved on appeal only by the International. In view of our decision affirming summary judgment for the International on other grounds, we need not reach its argument that the district court erred in refusing to dismiss the complaint for failure to exhaust internal union remedies
 
 
 [9]
 For example, in his affidavit, plaintiff Eugene Cardoni asserts that he attempted to re-enter the union after Blazejewski retired and was denied access because Blazejewski conspired to defeat his re-entry. App. at 260. A letter written by Blazejewski seems to provide some support for Cardoni's allegation. App. at 736-37. The parties have not fully briefed whether such action by Blazejewski could establish a breach of the union's duty of fair representation, an issue we leave to the district court
 
 
 [1]
 Contrary to the majority's assertion at footnote 6 of the opinion, at 1290, I believe there is ample basis in the record to conclude that the plaintiffs had reason to fear Blazejewski
 
 
 [2]
 The majority concludes, footnote 6 of the opinion at 1290, that this past intimate relationship is belied by Blazejewski's references in the letter to his brief meeting with Anello in St. Louis and Chicago. Those brief meetings are in no way suggested as their only meetings, and in view of the conceded history of Anello's investigations of Blazejewski, it is hardly likely that they had met only in St. Louis and Chicago. See, e.g., reference to letters from plaintiffs at dissenting opinion at 1306
 
 
 [3]
 Section 6A of the Union Constitution provides in part:
 The United Brotherhood is empowered, ... in the discretion of the General President subject to appeal to the General Executive Board, ... to establish or dissolve any Local Union or Council, to merge or consolidate Local Unions or Councils,.... The vested rights of the members shall be preserved and where action as herein described is taken the General President and General Executive Board shall preserve the membership rights of the members of affected Local Unions, including their right to attend and participate in meetings, to vote, to nominate candidates and to be nominated and run for office or business representative. (Emphasis supplied).
 The placement of the United Brotherhood's unqualified guarantee that the members' rights shall be preserved within this section describing the United Brotherhood's power to reorganize subordinate units does not, as the majority contends, negate that guarantee for all other purposes. Indeed, this reference constitutes an explicit recognition that union members have vested rights to vote, participate in union meetings, and hold union office, which are preserved by the constitution of the United Brotherhood.